## WITHERS *vs.* COYLES.

[ACTION BY MASTER, AGAINST MUNICIPAL MAGISTRATE, FOR FALSE IMPRIS-
ONMENT OF SLAVE.]

1. *Power of municipal magistrate, under ordinance, to imprison slave in default of bond for good behavior.*—Under the 15th section of the act of 1844, "to consolidate the several acts of incorporation of the city of Mobile, and to alter and amend the same," (Session Acts 1843–4, p. 180,) and the ordinance "for the punishment of vagrants and disorderly persons," (Digest of City Charters and Laws of Mobile, 145,) the mayor has no authority or jurisdiction to require a slave to give a bond for his good behavior, or to commit him to jail in default of the execution of such bond.

2. *When civil action lies against magistrate.*—If a municipal magistrate erroneously determines, on the evidence adduced before him in a particular case, that a slave is a free person of color, and therefore inflicts on him the punishment ordained exclusively for free persons of color, he is not liable to a civil action at the suit of the slave's master; *secus,* if, after correctly determining the *status* of the slave, he inflicts on him the punishment provided exclusively for free persons of color.

APPEAL from the Circuit Court of Mobile.

Tried before the Hon. C. W. RAPIER.

The complaint in this case was in these words:

"James Coyles *vs.* Jones M. Withers, and Henry Maury.} The plaintiff claims of the defendants five hundred dollars damages, for the wrongful taking and keeping of a slave belonging to plaintiff, named Battiste, for a long space of time. Also, a like sum, for unlawfully imprisoning and keeping said slave, the property of plaintiff, knowing him to be the property of plaintiff. Also, a like sum, for wrongfully causing said slave to be imprisoned and kept from plaintiff. Also, because, plaintiff being the owner of said slave, and having hired him to one F. Hurtel, upon the terms and condition that said Hurtel should pay for the hire of said slave a large sum of money, to-wit, at the

rate of twenty dollars per month during the time he should be in said Hurtel's employment, and that plaintiff should receive nothing for, and should be himself the loser of all the time during which said slave should, by sickness or any other cause of absence, be out of said Hurtel's employment; they, the said defendants, caused said slave to be unlawfully imprisoned, and kept in close confinement, and out of the employment of said Hurtel and plaintiff, for a long space of time, to-wit, the space of four months. To plaintiff's damage two hundred dollars."

The defendants demurred to the complaint, on the following specified grounds: "1st, because there is a misjoinder of actions; and 2d, because the defendants do not know, from the complaint, whether the action is assumpsit, trover, trespass for false imprisonment, or an action on the case for damages, and cannot tell what plea to make and put in." The court overruled the demurrer, and the defendants then pleaded "the general issue, with leave to give in evidence any special matter of defense."

On the trial, as the bill of exceptions shows, the plaintiff read in evidence certain entries on the docket of the defendant Withers, "as acting mayor of the city of Mobile," and in his handwriting, showing that the slave Battiste was tried and examined before said Withers, on the 27th October, 1856; and that a judgment was then rendered against him, as expressed in the entry on the docket, in these words: "Stripes, and bond, $500, good behavior"; but the nature of the charge against him was not described in said entries, except by the single word "Examination." "The plaintiff then proved, that said slave belonged to him, and, at the time of the seizure and imprisonment, was hired out, under a special contract, to one Hurtel of Mobile, and was in his possession and service, in the business of storing and compressing cotton; that the services of said slave were worth $16 66 per month; that said slave was whipped under the orders entered on said docket, and, on the non-execution of the bond as therein specified, was, on the 27th October, 1856, by the order of the defendant Withers, committed

to the city guard-house, and remained in confinement under that commitment until the 17th January, 1857."

"The defendant Withers then proved, that he was the mayor of the city of Mobile at the time said orders and commitment were made, and made said orders and entries in his official character as such mayor; and offered in evidence the charter for the incorporation of the city of Mobile, and the ordinances of said city, legally and regularly passed; and justified said orders and commitment under the facts and evidence herein stated. The defendant introduced evidence tending to show that, on said 27th October, 1856, said slave was brought before him, while holding court as mayor, and was charged with gambling on the Saturday night previous, with some eighteen other negroes, on the premises of said Hurtel, contrary to the city laws and ordinances; [and that proof was at the same time made to him, so sitting as mayor, that said slave was a dangerous and disorderly character, and had kept an assignation-house, and had repeatedly violated the laws of the city and State, and continually eluded the police officers, and resisted them by struggling to get away and running, and frequently escaped from them. He offered evidence, also, tending to show that, on the hearing of said complaint before him, evidence was adduced tending to show that, prior to said complaint, various citizens of Mobile had frequently complained to the police that they lived in terror and alarm of said slave, and were afraid to leave their houses on account of him; that he had been brought up before a former mayor of the city, in the year 1854, on a charge of burglary, and had been shot at therefor; that he stole fowls, and had been in the habit of having unlawful assemblies of slaves at his house, and of gambling with slaves at night, and of harboring runaway slaves, and had kept an assignation-house for persons of ill fame; that he very frequently changed his place of staying at night; that it was difficult for the police officers to find him, and difficult to arrest him when found; that he had gone greased, in order to facilitate his escape, and wore his clothes without buttons, in such a manner that he could

and did readily divest himself of them when seized; that he had to be overcome when arrested, and fought and resisted one of the officers; that he was a bad and dangerous character; that he was found on the night preceding said examination and complaint, with some eighteen other negroes, in a cotton-press then rented and used by said Hurtel, where it was unlawful for him to be at such a time, and for such a purpose; that said slaves were singing, dancing, and gambling; that when ordered by the officers to open the door of the house, they refused, and the door had to be prized open by the officers. One of the defendant's witnesses, who was one of the police officers who arrested said slave, testified, on cross-examination, that he had never heard of said slave resisting or using violence towards any white person; and there was no evidence before the mayor that he had done so, except of his having once resisted a police officer who was trying to arrest him; that said slave made his escape, and was arrested with great difficulty on the next day; and that he refused to surrender to the police officers, even when they threatened to shoot him if he did not, but did not resist them except by trying to elude them.] It was upon the evidence and complaints above stated that the said entries and orders were made by said Withers in his official capacity, and while holding his court as mayor; and evidence was offered by him to show that such was the case, and that the whipping was ordered and inflicted for the charge of gambling. The defendant offered to prove the facts and matters above set forth; but the court would not permit him to prove the matters" which are enclosed in brackets, "unless he proposed to further prove, that complaint was also made of threats or danger from said slave to the person or property of some particular individual, which said defendant did not propose to do; and to this ruling of the court said defendant excepted."

"The court ruled as follows: 1. That slaves were not within the provisions of the 15th section of the city charter, approved January 15th, 1844, in these words: '*To cause all vagrants, idle or disorderly persons, all persons of*

*evil life or ill fame, and all such as have no visible means of support, or are likely to become chargeable to the city as paupers, or are found begging, or drunk in or about the streets, or loitering in or about tippling-houses, or who can show no reasonable course of employment in business in the city, all who have no fixed place of residence, or cannot give a good account of themselves, all who are grossly indecent in language or behavior publicly in the streets, and all public prostitutes, or such as lead a notoriously lewd or lascivious course of life, to give security for their good behavior for a reasonable time, and to indemnify the city against any charge for their support, and, in case of their inability or refusal to give such security, to cause them to be confined to labor for a limited time, not exceeding four calendar months, unless such security shall sooner be given,—which said labor shall be designated by the said mayor, aldermen and common council, for the general benefit of the said city; and that the labor so designated shall be carried into effect, the said mayor, aldermen and common council shall have power to appoint a person or persons to take those so confined and sentenced to labor from their place of confinement to the place appointed for their working, and watch them while at labor, and return them before sundown to the place of confinement; and if they shall be found afterwards offending, such security may be again required, and, for want thereof, the like proceedings may again be had, from time to time, as often as may be necessary';* and that the ordinance made under said section, entitled 'An ordinance for the punishment of vagrants and disorderly persons', did not embrace slaves within its provisions; and that the defendant, as mayor, had no right to require a bond that said slave should keep the peace and be of good behavior, or be committed in default thereof.

"2. That the defendant had no right under the statutes of the State, as magistrate and conservator of the peace, to require that a bond to keep the peace should be given for said slave, and, if not given, to order the commitment of said slave, unless complaint and proof were made of danger or threats from said slave to the person or property of some particular individual.

"3. That if the defendant had no right to require such

bond to be given, or to order such commitment, in the case proposed to be proved, he could not be protected on the ground that he was acting judicially in making such an order, but was liable to the plaintiff for the damage sustained by the loss of the slave's hire or services for the time he was imprisoned by reason of the imprisonment."

To each of these rulings of the court the defendant excepted; and he now assigns them as error, together with the overruling of the demurrer to the complaint, and the exclusion of the evidence as above stated.

There was an agreement of record between the counsel of the respective parties, "that the city charter and ordinances, as printed and published before the 27th October, 1856, may be read in evidence in the supreme court, as if embodied in the bill of exceptions." The material portions of the charter and ordinances, it is believed, are copied in the opinion of the court. As no copy of them accompanies the record, or has been furnished to the reporter, he can only refer to them as cited in the opinion.

R. H. SMITH, for appellant.

A. R. MANNING, contra.

STONE, J.—While slaves are, under our system, property and chattels, they are, nevertheless, in many senses, persons. We had occasion to consider this question in the case of Hudson v. The State, 34 Ala. 253. Hence, in many cases, and for many purposes, we would hold, that the word persons, when employed in a statute, includes slaves as well as free white persons. Whether slaves are included in the descriptive word persons, as found in the Mobile city charter and ordinance enacted thereon, which are brought to view in the present case, must depend on the intention of the law-making power, to be gathered from the language in which the legislation is clothed.

In 1844, an act was passed, consisting of many sections, " to consolidate the several acts of incorporation of the city of Mobile, and to alter and amend the same." See Digest of City Charters, (1849,) p. 17. Section 15 of that consolidated act (Pamphlet Acts 1843–4, p. 175; Di-

gest of City Laws, pp. 29, 30) empowers the mayor, aldermen and common council to enact by-laws and ordinances, for various sanitary and police purposes, affecting the welfare of the city. These powers are apparently classified and arranged, in accordance with the objects of which they treat. That portion of the charter which bears on the questions presented by this record, is in the following language: " To restrain and prohibit the nightly and other meetings or disorderly assemblies of slaves, free negroes and mulattoes; to punish such slaves by whipping, not exceeding twenty stripes, and to punish such free negroes and mulattoes and other persons for such offense, by affixing penalties, not exceeding fifty dollars for any one offense, and, in case of the inability of any such free negro, mulatto, or other person, to pay and satisfy any such fine or penalty, and the costs thereon, to have such free negro, mulatto or other person to be confined to labor, for such reasonable time, not exceeding three calendar months for any one offense, as may be deemed equivalent to such penalty and costs,—which said labor shall be such as shall be designated by said mayor, aldermen and common council, for the general benefit of said city; to cause all vagrants, idle or disorderly persons, all persons of evil life or ill fame, and all such as have no visible means of support, or as likely to become chargeable to the city as paupers, or are found begging, or drunk in or about the streets, or loitering in or about tippling-houses, or who can show no reasonable course of employment in business in the city, all who have no fixed place of residence, or can not give a good account of themselves, all who are grossly indecent in language or behavior publicly in the streets, and all public prostitutes, or such as lead a notoriously lewd or lascivious course of life, to give security for their good behavior for a reasonable time, and to indemnify the city against any charge for their support, and, in case of their inability or refusal to give such security, to cause them to be confined to labor for a limited time, not exceeding four calendar months, unless such security shall sooner be given,—which said labor shall be designated by the

said mayor, aldermen and common council, for the general benefit of said city," &c.

Under these provisions of the charter, the mayor, aldermen and common council of Mobile passed an ordinance of twenty sections, "respecting slaves", the penalties for the violation of which were, in every instance, corporeal punishment.—Digest of City Charters, &c. 138. The city government also enacted an ordinance, "for the punishment of vagrants and disorderly persons."—Digest, 145. In this ordinance, the language of the charter in reference to this class of persons, given above, is literally copied; and the penalties provided by this ordinance are bonds for good behavior, and, in default of bonds, commitment to some place of confinement, to labor, &c.

It is not our intention, in this opinion, to declare whether the city government of Mobile may or may not institute precautionary measures of restraint, to operate upon the disorderly and insubordinate slave population within their midst. Nor do we affirm that the mayor may not, as a conservator of the peace, require that bond and security be given for the appearance of a slave at court, to answer for a criminal offense, or to keep the peace, in a proper case; and, in default of bond, commit the slave to prison for safe custody. The commitment in this case was for neither of the purposes last mentioned; and hence those questions are not before us. The imprisonment in this case was under the ordinance "for the punishment of vagrants and disorderly persons." The language of this ordinance, viewed in connection with the provisions which are expressly made for slaves, forces on us the conviction, that slaves are not within the purposes, provisions or spirit of the enactment which requires bond for good behavior. The mayor erred in requiring bond for the good behavior of the slave Battiste, and in committing him to prison in default of such bond.

[2.] The question of the liability of judicial magistrates, for errors committed by them in the discharge of their official functions, has been much discussed. Two distinctions have been taken: 1st, between courts of general, and courts of limited or special jurisdiction;

and, 2d, between the erroneous exercise of powers within the jurisdiction of the court or magistrate, and the exercise of authority not within his jurisdiction. A third distinction, between honest mistakes and fraudulent or malicious abuse of authority, has been also considered; but no question of the latter kind has been presented by this record.

The jurisdiction of the mayor of Mobile is of the class called limited, or statutory; and hence we need not consider the rule in regard to general jurisdictions.—See the case of the Marshalsea, 10 Rep. 68; Yates v. Lansing, 5 Johns. R. 282, 287; Hamilton v. Williams, 26 Ala. 527.

Whether the appellant is liable in this action, must depend on the inquiry, Did he, in committing the slave to prison, simply err in a matter within his jurisdiction, or did he transcend the boundaries of his jurisdiction? In Doswell v. Impey, (1 B. & C. 169,) Abbott, C. J., said: "The general rule of law, as to actions of trespass against persons having a limited authority, is plain and clear. If they do any act beyond the limitation of their authority, they thereby subject themselves to an action of trespass; but, if the act done be within the limit of their authority, although it may be done through an erroneous or mistaken judgment, they are not thereby liable to such an action."—See Duckworth v. Johnson, 7 Ala. 578; Craig v. Burnett, 32 Ala. 728.

A distinction is well taken in the books, between those cases where, the facts being plain and clear, the judicial magistrate misapplies the law to those plain facts, and cases in which the facts appear erroneously in evidence, or the judge or magistrate by mistake draws an erroneous conclusion of fact from the proof in the particular case. The inferior magistrate is responsible, not for the abstract truth of the case before him, but only for the case as it appeared before him on the trial. For errors of fact, or for an erroneous judgment as to matters of law within his jurisdiction, he is not responsible. For assuming, however, that he has jurisdiction to do a particular thing, on certain facts proved, or supposed to exist, when he has no power to do that particular thing

Withers v. Coyles.

on the state of facts proved or supposed to exist, he transcends his jurisdiction, and becomes a trespasser.

Application: If, on the trial, the mayor had concluded from the evidence, whether correctly or otherwise, that Battiste was a free person of color, and had inflicted on him such punishment or restraint as the ordinance authorized to be inflicted on free persons of color, no one would be heard to complain, in a suit such as this, either that the mayor had erroneously found Battiste to be free, or that he had adjudged him guilty on insufficient testimony. If, however, Battiste was a slave, and was so found by the mayor, and thereupon the mayor imposed on him such penalties and disabilities as were provided and ordained for free persons exclusively,—then the mayor, in this particular, acted beyond the scope of his jurisdiction. These principles are fully sustained by the following authorities: Duckworth v. Johnson, *supra;* Craig v. Burnett, *supra;* Morrow v. Bird, 6 Ala. 834; Sasnett v. Weathers, 21 Ala. 673; Lowther v. Earl of Radnor, 8 East, 113; Houlden v. Smith, 14 Ad. & El. (N. S.) 841; Edwards v. Ferris, 7 C. & P. 542; Cooper v. Horton, 8 Dowl. & Ryl. 166; the case of Marshalsea, 10 Rep. 68, 76, *et seq.;* Terry v. Huntington, Hard. 480; Pratt v. Hill, 16 Barb. 303; Marsh v. Williams, 1 How. (Miss.) 132; Bigelow v. Stearns, 19 Johns. 39; Suydams v. Keyes, 13 Johns. 444; Blood v. Sayre, 17 Verm. 609; Coltraine v. McCain, 3 Dev. 308; Jones v. Hughes, 5 S. & R. 299; Cohoon v. Speed, 2 Jones' Law Rep. 133; Piper v. Pearson, 2 Gray, 120; 5 Bouv. Bacon, *Justice of the Peace*, F., pp. 430, 431; 2 Hill. on Torts, 320, *et seq.*

It is one of the uncontroverted facts in this case, that Battiste was a slave. There is no pretense that any evidence was offered before the mayor that he was free. Under these circumstances, we hold, that the mayor had no authority to require a bond that such slave would be of good behavior; and that, in committing Battiste to prison in default of such bond, he acted beyond his jurisdiction.

The rulings of the circuit court are in accordance with these views, and its judgment is affirmed.